**AMERICAN COMMERCIAL LINES, INC., a corporation, Libelant-Appellant,**

v.

**SILVER CREEK COAL COMPANY, a corporation, Respondent-Appellee.**

No. 16180.

United States Court of Appeals Seventh Circuit.

March 25, 1968.

Harvey Wienke, Elmer Michael Walsh, Jr., Chicago, Ill., McBride, Baker, Wienke & Schlosser, Chicago, Ill., of counsel, for appellant.

Herbert C. Loth, Jr., Gene A. Knorr, Peterson, Lowry, Rall, Barber & Ross, Chicago, Ill., Timothy G. Lowry, Richard V. Henry, Jr., Chicago, Ill., Sheribel Rothenberg, of counsel, for appellee.

Before HASTINGS, Chief Judge, and CASTLE and CUMMINGS, Circuit Judges.

HASTINGS, Chief Judge.

Libelant-appellant American Commercial Lines, Inc. appeals from a judgment entered December 29, 1966 in favor of respondent-appellee Silver Creek Coal Company. The libel, filed April 17, 1963, charged that appellee negligently caused the sinking of appellant's barge BL–469 on February 3, 1958.

There is little dispute concerning the facts prior to the day of the sinking. Appellant had used the barge to transport coal on the Illinois Waterway since the mid-1940's. The age of the barge was not in evidence. The barge was a steel-hulled open hopper with a wood floor. It had a length of 175 feet, a beam of 26 feet and a draft of 11 feet when fully loaded. There was no evidence of its involvement in an accident.

Between January 2 and 10, 1958, shortly before the sinking, the barge was in drydock at appellant's Alton, Illinois shipyard for repairs. Cracks in the hull of the barge were welded and damage to its cargo floor was repaired.

After completion of the repairs, the barge was loaded with 837.25 tons of coal at an Alton coal dock. The coal was consigned by Peabody-Southern Coal Company to Swift & Co., in care of appellee Silver Creek Coal Company at Chicago, Illinois. From January 18 until January 22 the barge was in tow, moving up the Mississippi River and the Illinois Waterway to Lemont, Illinois. It remained at Lemont until January 28, when it was towed to appellee's dock in Chicago for unloading. Appellant's towboats were used the entire journey.

Appellee removed coal from the barge on January 29 and 30, using a diesel railroad crane that ran alongside the slip where the barge was tied. On January 30,[1] appellee notified appellant that the partially unloaded barge contained water. Appellant sent two men with equipment to pump the barge. Water was pumped continuously for five or six hours, although there was no evidence of the volume of water pumped. No work was

[1] The trial court found that the pumping was done January 31. Both appellant's libel and appellee's answer to interrogatories state that it was done January 30. None of the witnesses who testified concerning the pumping stated that it was done on January 31; the only witness who testified to the time said it was January 29 or 30. The sole support for the trial court's finding is the date given in appellant's trial brief and repeated in appellee's trial memorandum. In any event, the date has little significance.

done on January 31 or February 1 or 2, a weekend period.

The unloading operation was resumed on Monday, February 3. There is disagreement concerning the amount and placement of coal remaining in the barge. Water was nearly knee-deep in the north (stern) end of the barge. At approximately 9:30 a. m. both sides of the barge broke amidships and the floor buckled between the breaks. The south (bow) end quickly sank below the surface in sixteen feet of water, while the north end remained awash. About fifty tons of coal had been removed from the barge on February 3 before the sinking.

■ After hearing and examining the evidence, the trial court received proposed findings by both parties and entered findings submitted by appellee. Findings prepared and submitted by partisans and adopted by the trial court will stand if supported by the evidence; findings "drawn with the insight of a disinterested mind are, however, more helpful to the appellate court." United States v. El Paso Natural Gas Co., 376 U.S. 651, 656, 84 S.Ct. 1044, 1047, 12 L.Ed.2d 12 (1964).

■ Appellant challenges several of the trial court's findings as unsupported by the evidence. The scope of our review of the findings of a district court sitting in admiralty is the same as that we exercise under Rule 52(a), F.R.Civ.P., 28 U.S.C.A. We may not set aside the trial court's findings unless they are clearly erroneous. McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954); Commercial Transport Corp. v. Martin Oil Service, Inc., 7 Cir., 374 F.2d 813 (1967); In re Rapp's Petition, 7 Cir., 255 F.2d 628 (1958).

Appellant first challenges the court's finding that "The evidence does not show that the barge was seaworthy when delivered to the dock." Appellant concedes that it had the duty to furnish a seaworthy barge. Cf. Commercial Transport Corp. v. Martin Oil Service, Inc., supra. It also concedes that it had the burden of proving the seaworthiness of the barge. Cf. Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89 (1941).

To prove seaworthiness, appellant introduced evidence that the barge was inspected and found seaworthy after repairs at Alton and before it was loaded with coal, that it had never been involved in an accident and that its journey to appellee's coal dock was eventless. This evidence, appellant contends, raised a presumption that the seaworthy condition of the barge continued until appellee began unloading it. Cf. 2 Wigmore, Evidence § 437 (3d ed. 1940). Assuming appellant's evidence was credible, it gave rise to a presumption of continued seaworthiness. The strength of the presumption depended upon the probability that intervening circumstances impaired the seaworthiness of the vessel, and appellee could rebut the presumption by evidence of such a probability. Ibid.

We conclude that the presumption of seaworthiness, if it was raised, was rebutted by appellee's evidence that the barge contained water two days after its delivery to appellee's dock and had to be pumped for five or six hours. Appellant's explanation of the presence of the water, attributing it to snow and condensation, is inadequate. There is undisputed evidence that appellant's towboat crews had orders to inspect barges in tow every six hours for presence of water and to pump out any water discovered. The barge was in tow for eleven hours on January 28, the day it was delivered to appellee's dock. If the towboat crews followed their orders, the barge should have been substantially dry when delivered. There was irrefutable evidence that between January 28 and February 3 there was negligible precipitation in Chicago and that the temperature did not rise above freezing. This evidence would have supported a strong inference that the water pumped from the barge on January 30 had leaked in after delivery of the barge on January 28.

Appellant also introduced the testimony of Thomas Bown, a marine sur-

veyor who examined and raised the barge. He had conducted about 200 salvage operations involving barges or towboats. He testified that in his opinion appellant's barge was seaworthy when delivered to appellee's dock and that the breaking of the barge could only have been caused by improper unloading that placed disproportionately great load stresses on the ends of the barge. His inspection of the barge immediately after sinking and in drydock revealed no cracks or holes other than the tears and buckles amidship. The edges of the torn steel when examined immediately after the sinking were shiny, indicating their freshness. Inspection revealed a thirteen inch streak of dark rust along the tear on the inside of the hopper wall and along the top of the gunnel deck on one side of the barge. Bown testified that the streak was probably caused by appellee striking the barge with its discharge bucket during unloading operations. In his opinion the crack, assuming it was a crack, did not contribute to the breaking of the barge.

Even accepting Bown's expertise and the correctness of the physical principles he applied, the trial court's rejection of his opinion on seaworthiness was not clearly erroneous. Bown's opinion that the barge was seaworthy was based on the assumption that the barge did not leak after it was pumped out on January 30 until it sank on February 3, and on the further assumption that at the time of the sinking there were 50–140 tons of coal in the "extreme" north end of the barge. Both of such assumed facts were disputed in the evidence. The trial court reasonably could have found the facts to be other than Bown assumed them to be. For that reason, if none other, the trial court's finding that the barge was unseaworthy is not clearly erroneous.

Bown testified that in his opinion a clean break of the character here shown could only have been caused by placing disproportionately great load stresses on the ends of the barge. However, we are not persuaded by his major premise that a barge which sinks only because of the concentration of load stresses at its ends is seaworthy. It would appear that a seaworthy barge should be capable of withstanding the stress of a reasonable load imbalance. As Bown testified, the breaking force at the middle of a barge with such a load concentration is a function of the weight at the ends and the distance of the weight masses from the middle or focal point. It could vary from slight to substantial.

Appellant also challenges the trial court's finding that "[by the morning of the sinking] coal had been removed in such fashion that there remained in the barge coal extending from a point amidships to the south end of the barge and having a depth of approximately five to six feet (being two-thirds of the original depth)," and the court's finding that "There is no evidence that the barge was not unloaded in accordance with accepted principles." These findings obviously reflect the appellee's theory of the sinking.

The parties agree that the proper procedure for discharging coal or similar cargo from a barge is to begin at one end and move to the other removing a layer of constant depth, then repeat the process once or twice, reversing direction, until the load is discharged. This procedure prevents greatly disproportionate load stresses at the center or at the ends of the barge. There is some dispute over the number of passes that should be made and the depth of the layer of coal that should be removed on each pass. That dispute has little relevance, since appellant contends appellee did not follow the basic procedure.

Appellant's theory of the case is that the barge was unloaded improperly so that on the morning of the sinking there were approximately 100 tons of coal in the north one-third of the barge, 135–150 tons in the south one-third, and little or no coal in the center one-third. The stress produced by this load imbalance, appellant contends, broke the barge and caused its sinking.

Appellant introduced the testimony of marine surveyor Bown and one of appel-

lee's former employees, who was working in the barge when it broke. Both stated that there was a substantial amount of coal in the south half of the barge. Bown testified that soundings and visual inspection by a diver after the sinking disclosed a pile of coal eight feet high and thirty-five or forty feet long at the extreme south end. He estimated the weight of the coal at 135–150 tons. The workman testified that before the barge sank coal covered the south half of the barge and was six to eight feet high in places. Bown further testified that one of appellee's officials told him there were about 150 tons of coal in the sunken south half of the barge.

In answer to an interrogatory, appellee stated that fifty tons of coal were removed on February 3 before the barge sank. According to the testimony of appellee's general manager and the workman who was in the barge such coal was removed from the north end.

Appellant also introduced evidence that appellee continued discharging coal from the north end of the barge for approximately one hour *after the sinking*. Appellant's maintenance supervisor and two welders testified that they were at the scene of the sinking for periods ranging from ten minutes to an hour between 9:30 and 11:00 a. m. on February 3. They saw appellee's crane removing coal from the north half of the barge while they were there.

This evidence, if credible, indicates that coal was discharged from the north end for a maximum of one and one-half hours *after sinking*. Appellant's evidence fixed the capacity of appellee's discharge crane at seventy tons per hour, while appellee's evidence fixed it at forty tons per hour. There was no direct evidence of the amount of coal removed after sinking. There was evidence that the north end was "bucket clean" *on the day following the sinking*.

As appellant concedes in its brief, there is no direct evidence that the center of the barge contained little or no coal

at the time of the sinking. The workman who was in the barge testified he jumped across from the south to the north end as the barge broke and sank. The surveyor testified that soundings and inspections made on the afternoon of the sinking disclosed that the sunken bow end was "bucket clean" toward the break.

Appellee countered appellant's evidence with testimony by its officers that its crane operator,[2] who was experienced, had used the proper procedure in unloading the barge. They stated that at 8:00 a. m. on the morning of the sinking the barge contained a three or four foot layer of coal and the crane operator was making his last pass beginning at the north end.

Most of the 135–150 tons of coal found in the sunken south end were subsequently removed. However, an additional 120 tons were lost.

Considering this evidence, we hold that the trial court's findings are not clearly erroneous. Appellant's evidence on the amount and location of coal in the barge, assuming the trial court credited it, is consistent with the findings. The court found that prior to the sinking a five or six foot layer of coal extended from a point amidships to the bow (south) end of the barge and that there was no evidence of improper unloading.

The barge broke forward (southward) of its mid-point and the south or shorter end sank rapidly. The sunken end came to rest at an angle of nearly twenty degrees and was twisted. Witness Bown testified that the coal in the south end could not have shifted to form the eight foot high, 135–150 ton pile found at the extreme south end. Bown stated that he based his opinion on experience in raising coal barges. Counsel did not further explore the basis of his opinion.

On this evidence it would not have been unreasonable to infer that when the heavily-laden south end suddenly broke and rapidly sank, twisting and coming

---

2. The crane operator was deceased at the time of trial.

to rest at a near twenty degree angle, some of the coal near the break shifted toward the bow. Neither would it have been unreasonable to infer that part of the missing 120 tons of coal were lost from the vicinity of the break, the center of the barge.

■ In the absence of direct evidence of the amount and placement of the coal removed from the north or larger portion of the barge *after sinking*, the trial court reasonably could have inferred that it was removed from the vicinity of the break rather than from the extreme north end and that the amount removed was less than the 50–140 tons estimated by appellant. It would not have been unreasonable to infer that coal was discharged from the bottom of the partially-sunken north end at a rate slower than the forty to seventy ton-per-hour rate of discharge possible under normal conditions.

■■ Appellant argues that it is entitled to recover under the doctrine of *res ipsa loquitur*. Unquestionably that doctrine has application in admiralty. Johnson v. United States, 333 U.S. 46, 68 S.Ct. 391, 92 L.Ed. 468 (1948); United Fruit Company v. Marine Terminals Corporation, 9 Cir., 376 F.2d 1007 (1967); Logan Charter Service, Inc. v. Cargill, Inc., 8 Cir., 373 F.2d 54 (1967). However, "*res ipsa loquitur* means that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; that they furnish circumstantial evidence of negligence where direct evidence of it may be lacking, but it is evidence to be weighed, not necessarily to be accepted as sufficient * * *." Sweeney v. Erving, 228 U.S. 233, 240, 33 S.Ct. 416, 418, 57 L.Ed. 815 (1913). And see Johnson v. United States, supra; United Fruit Company v. Marine Terminals Corporation, supra. Even if the doctrine were applicable, the court's findings are not clearly erroneous, particularly in light of the direct evidence of proper unloading by appellee.

■ Appellant's final contention is that appellee failed to discharge its duty to inspect the barge for water and warn appellant if it was leaking. Appellant knew there was water in the barge on January 30 and that five or six hours of continuous pumping were necessary to expel it. Such evidence did not require a finding that appellee failed to inspect the barge and warn appellant of its dangerous condition on the morning it sank. There was no clear error.

The judgment appealed from is affirmed.

Affirmed.