Mrs. Francis Nell HIGGINBOTHAM,
Admx., etc., of Marshall K. Higgin-
botham, Deceased, etc.

v.

MOBIL OIL CORPORATION et al.

Mrs. Wanda Moore LONG, Admx. of Est.
of Deceased Joseph C. Long, Jr., etc.

v.

BELL HELICOPTER CO., etc., et al.

Jeanette LeBlanc NATION, personal rep-
resentative for Ella Menard Nation
and Roy Glen Nation

v.

TEXTRON INDUSTRIES, INC.,
etc., et al.

Mrs. Arline J. SHINN, Ind., etc.

v.

MOBIL OIL CORPORATION.

Civ. A. Nos. 13954, 13958, 15316
and 15326.

United States District Court,
W. D. Louisiana,
Opelousas Division.

April 25, 1973.

**1166**

Charles M. Thompson, Jr., Abbeville, La., for Nell Higginbotham and Jeanette LeBlanc Nation.

Jack C. Caldwell, Aycock, Horne, Caldwell & Coleman, Franklin, La., for Wanda Moore Long.

Jack C. Benjamin, Kierr & Gainsburgh, New Orleans, La., for Arline J. Shinn.

Carl J. Schumacher, Jr., and Robert E. Badger, Lemle, Kelleher, Kohlmeyer, Matthews & Schumacher, New Orleans, La., for third party plaintiff, Mobil Oil Corp.

Carl J. Schumacher, Jr., and Robert E. Badger Lemle, Kelleher, Kohlmeyer, Matthews & Schumacher, New Orleans, La., Ronald Neill, Dallas, Tex., for defendant Mobil Oil Corp.

Richard K. Christovich and C. Edgar Clouthier, Christovich & Kearney, New Orleans, La., James F. Fitzsimons, Mendez & Mont, New York City, for Bell Helicopter Co. and Bell Aerospace Corp.

NAUMAN S. SCOTT, District Judge:

These four actions were brought by the representatives of the pilot, Joseph Clyde Long, Jr. (Long), and three passengers, Marshall K. Higginbotham (Higginbotham), James Lex Shinn (Shinn) and James E. Nation (Nation), of a helicopter which crashed on August 15, 1967 in the Gulf of Mexico about 100 miles south of Morgan City, Louisiana. The aircraft was a Bell helicopter, Model 206A Jet Ranger, Serial No. 46 (the 46th such craft sold by Bell) bearing the official registration number N7846S. The aircraft was only two months old at the time of the crash, having been purchased by Mobil Oil Corporation (Mobil) from Bell Helicopter Company (Bell) on June 6, 1967. It had been flown a total of 165 hours and 45 minutes. Bell was the manufacturer and Mobil was the owner and operator of the helicopter. The pilot Long, an employee of Mobil, had left Morgan City at approximately 1:50 P.M. with Shinn and other passengers whom he dropped at Baxter Rig No. 3 where he had picked up the two other passengers Higginbotham and Nation. The aircraft took off from Baxter Rig No. 3 between 3:30 and 4:00 o'clock in the afternoon and simply disappeared without trace of the aircraft or its passengers except a small portion of the aircraft recovered later that afternoon, including the bottom part of the cabin with the pontoons attached and that portion of the tailboom located in the rear of the horizontal stabilizer. The helicopter crashed between one and three miles from the site of takeoff.

Mrs. Frances Nell Higginbotham and Jeanette LeBlanc Nation, representatives of Higginbotham and Nation respectively, instituted their actions

against Bell and Mobil. In both cases Mobil filed cross-claims against Bell seeking indemnification and/or contribution for all liability adjudged against Mobil, indemnity for all benefits paid under the Longshoremen's and Harbor Workers' Compensation Act and recovery for the loss of its aircraft.

Mrs. Arline J. Shinn, the representative of Shinn, filed her complaint (amended) against Mobil and Bell, and Mobil filed a third party demand against Bell similar to that filed by it in the other two suits.

Mrs. Wanda Moore Long filed her action against Bell. Mobil is not a party to this action. The four actions were consolidated for trial.

■ The accident occurred on high seas over the outer Continental Shelf in the Gulf of Mexico far outside the boundaries of the State of Louisiana, and thus satisfies the traditional locality test of jurisdiction, The Plymouth, 70 U.S. (3 Wall.) 20, 18 L.Ed. 125 (1866). The fated helicopter was owned and operated by Mobil in conjunction with its extensive offshore activities, and, at the time of the fatal accident, was performing the ordinary functions of a crewboat. Unquestionably it was engaged in maritime activity and was not operating as a "land-based aircraft between points within the continental United States." Executive Jet Aviation v. Cleveland, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972). We have jurisdiction.

The liability of Bell, whether under the Death on the High Seas Act, the General Maritime Law, or the Laws of Texas or Louisiana, should first be considered as an issue of fact. The primary contention of plaintiffs and Mobil against Bell is that the tailboom of the N7846S completely separated from the remainder of the aircraft while in flight. The contention is that this separation occurred just aft of the horizontal stabilizer (the forward end of that portion of the tailcone identified as "Plaintiffs' Exhibit P–1"). As a result, the aircraft became uncontrollable and subsequently crashed into the Gulf of Mexico. Plaintiffs and Mobil further contend that Bell was negligent in designing and manufacturing a faulty product without adequate testing procedures and that this negligence on the part of Bell was the sole and proximate cause of the accident. Specifically, plaintiffs and Mobil advance and attempt to support the theory that a fatigue crack (or cracks) originating in the lower left quadrant (looking aft) of the 360° fracture on the forward end of Exhibit P–1, propagated in fatigue approximately four inches to a point at which the loads existing on the tailboom accelerated the propagation of the fracture which continued in tension resulting in complete separation. There is no dispute that the entire remaining circumference of the fracture on the forward end of P–1, save the approximate four inches mentioned above, failed in tension as opposed to fatigue. There is no disagreement that the tension portion of this fracture occurred relatively instantaneously, whether from loads in flight or loads which would occur upon striking the water. However, Bell disputes the existence of any fatigue fracture at all, and there is disagreement as to what effect the four or five inch crack (the alleged fatigue fracture above referred to) in this area of the tailboom would have on the ability of the boom to withstand the loads in experiences in flight operations over a period of several hours. Plaintiffs and Mobil offered no other contentions as to the direct cause of the disaster other than the separation of the portion of the tailboom in flight.

In determining this question of fact, the Court must rely on the testimony of experts who were most eminently qualified by education, training and experience. We have given due consideration to the comparative qualities of each of these experts; to their connections with the parties; to the extent and detail of the examinations conducted by each, and to the fact that very little (absolutely none of the main power and control units or instrument panel, no flight plan, no

communication, no performance record, taped or otherwise) of the aircraft remained and was available for analysis. To this degree any conclusion of the court or the experts is suspect. Although the failure-in-flight theory is novel, part of the explanation for this is the fact that the magnesium monocoque tailboom structure itself was novel and had been marketed commercially by Bell for a period of only about eight months prior to the accident of August 15, 1967. We find, under the circumstances, that the case of plaintiffs and Mobil against Bell hinges entirely on the validity of its metallurgists experts, Adams and Stewart; that the testimony of their other witnesses is principally corroborative and must fall if the metallurgists have failed to establish that the fracture at the forward end of Exhibit P–1 commenced in fatigue and propagated within a minute or so to complete failure. In addition to the considerations noted above we have endeavored to determine whether the theory of these two metallurgists, Adams and Stewart, is supported by other evidence in the case. For this purpose we have addressed ourselves principally to the forward edge of P–1 and have kept this exhibit before us at all times during our examination of the testimony.

It is conceded by all parties that magnesium alloy is relatively more sensitive to corrosion than most aluminum alloys when brought into contact with salt water and that the fracture surface on the forward edge of Exhibit P–1 was in fact corroded. Both of plaintiffs' metallurgy witnesses testified that the corrosion was advanced to a point to which it would obliterate the "classic characteristics" of fatigue type failure. The surface was however sufficiently preserved in order to show conclusively, according to all experts that tensil type fractures clearly existed in the circumference from 8:00 o'clock clockwise to 5:00 o'clock, looking aft at Exhibit P–1 while it is in an upright position.[1]

Having determined that the "classic characteristics" of fatigue fracture had been obliterated, plaintiffs' (and Mobil's) experts turned to less certain indicators. They were able to locate an area of relatively straight fracture which apparently can be indicative of fatigue failure. This is the area omitted from the reference to the tension fracture area mentioned above and extends from 5:00 o'clock clockwise to 8:00 o'clock. In portions of this questioned area there appeared a definite valley in about the center of the fracture face, running parallel to the lines formed by the outside edges of the fracture. Plaintiffs' (and Mobil's) metallurgy experts testified that such a formation was not found in tension fractures of sheetmetal material. Witness Stewart advanced the theory that the valley was caused by two separately occurring fatigue cracks, one on each side of the sheet metal, moving toward the center at an angle and converging to form an indentation.

The contention that a valley formation of this sort does not occur in tension type fractures was disputed by Bell's experts. Samples were cut from the tailboom of N7846S and placed in a device which applied loads to either end of the strip in opposite directions. These loads were increased until fracture occurred. In several of these samples there was a formation of a very sharply defined V-type valley on one portion of the broken strip and a corresponding pointed ridge on the other portion of the strip. Thus it was clearly demonstrated that such a formation can occur in a tension type

---

1. As to the area from 5:00 o'clock clockwise to 8:00 o'clock, all of Bell's experts were of the opinion that this too was clearly fractured in tension. Plaintiffs' metallurgical experts are not in entire agreement as to the extent of the fatigue fracture. One contended that it extended from 6:00 o'clock clockwise to approximately 8:00 o'clock. The other was of the opinion that the fracture began at a stress riser (rivet hole) near 5:00 o'clock and extended clockwise to a point between 7:00 and 8:00 o'clock. These areas overlap approximately four inches.

break of sheet metal of the type of which this tailboom was constructed.

Plaintiffs' (and Mobil's) witness Stewart cut a sample from the fracture surface of Exhibit P–1 at approximately 6:00 o'clock. This sample was taken within that portion of the fracture which plaintiffs and Mobil contend was a result of fatigue. The sample was examined in detail at various degrees of magnification up to approximately 1400 times its actual size. From this examination the witness testified that he observed no distortion of the grains in the form of elongation and bending at the fracture surface which is normally associated with tension type fractures and also that he did not find evidence of any "necking down" near the point where the fracture occurred. This so called "necking down" is a normal characteristic of a tensil type fracture of a malleable metal. These findings were the basis of his opinion that there was a fatigue type failure in the fracture surface at the forward edge of Exhibit P–1 originating at approximately 8:00 o'clock (where no stress riser was apparent) and propagating counter-clockwise to approximately 6:00 o'clock, with a very short area of tension type break sandwiched in between. Plaintiffs' (and Mobil's) other metallurgical expert, Adams, was highly qualified but did not make a very extensive study of the fracture. He agreed in general with the findings of witness Stewart. However, the fatigue fracture originated, in his opinion, at a point between 5:30 and 6:00 o'clock in an area where the fractured cell passed through a rivet hole and extended clockwise to a point somewhat short of 8:00 o'clock.

Bell's experts testified that any so called "necking down" which they agree occurred in tensil type breaks of malleable metals, could in fact be very subtle depending on the characteristics of the individual alloy and that no appreciable necking down would appear in a sheetmetal approximately .040 inches thick as is the case here. There was no more evidence of "necking down" in the area which admittedly failed in tension than there was in the area which plaintiffs' (and Mobil's) experts suggest failed in fatigue. Stewart's examination of a sample disclosing no elongation or distortion of grains of the metal itself was meaningless where admittedly there was no standard for comparison examined by witness Stewart, no known fractured surface in magnesium sheetmetal .040 inches thick which failed in fatigue was viewed by him under similar degree of magnification. Thus there was no basis for his opinion that the grains as he saw them were not sufficiently distorted to indicate tensil type fracture. In contrast to this evidence, Dr. Wiseman made an extended and detailed examination, chemically cleansed corrosion from a sample taken from another portion of Exhibit P–1 fracture surface and took photographs through an electron microscope (magnified 2,600 to 1) of the surfaces and offered textbooks, photographs and examples together with complete explanations indicating exactly how tension type failures would appear under the magnification at which he took his photographs as opposed to how fatigue type failures would appear under the same magnification. Dr. Wiseman also advanced the theory of how the valley type formation could occur in tensil type breaks. This theory was apparently borne out by the valley type formations which occurred in some of the tensil type tests conducted on this alloy.

In considering the evidence of these experts we are not unmindful of the fact that Bell's experts, with the exception of Dr. Wiseman, were its own employees, nor are we unmindful of our lack of expertise in this area. We have considered these opinions in conjunction with other evidence in the case principally Exhibit P–1 which has been physically exposed before us throughout our examination of this testimony. The thrust of the testimony of plaintiffs' (and Mobil's) experts is to the effect that a fatigue fracture propagated rapidly about four inches to a point where an intolerable stress load of compression at the top

and tension around the remaining surface of the tear resulting in an almost instantaneous completion of the fracture and separation of the tailboom from the rest of the aircraft. The forward edge of P–1 refutes this theory. The compressed area at the top of Exhibit P–1 is approximately seven inches wide and three inches deep at an angle of about 40°.[2] This area of compression is noted in the testimony of plaintiffs' experts. However, the existence of this area of compression tends to dispute rather than support plaintiffs' (and Mobil's) theory, especially when the adjacent areas of compression on the face of Exhibit P–1 are considered. If, as plaintiffs (and Mobil) contend, the tension fracture propagated from the ends of the alleged fatigue fracture, the principal force was extension, a tearing apart, to complete fracture. An examination of the forward edge of P–1 confirms that the tensil force exerted in that area was not one of extension, but of compression as would be exerted when forward movement of the aircraft was arrested on contact with surface of the water. Thus the area from about 10:30 to 11:30 is in compression in excess of 90° and overlaps the first named compression area to a considerable degree because of a tear behind the compression. The area from about 8:30 to 10:30 is in compression at about 90° and there are tears behind the compression at both the lower and upper extremities of this area. The area from about 1:00 to 3:00 o'clock is in compression about 30°. There is an area of compression between 2:30 and 3:30 (overlapping the immediately above mentioned area) of about 50° with a fracture behind the compression at both the upper and lower ends.

There is an area of compression of about 45° from 4:00 o'clock to 5:00 o'clock in the forward edge of Exhibit P–1 and a tear along the front edge of this area which continues behind and ap-

proximately parallel to the main tear to approximately 6:00 o'clock. This evidence is certainly not consistent with the theory that the tailboom was pulled apart by tension up to an area of compression at the top. On the contrary it indicates to us that practically the entire fracture occurred in compression. Severe compression of this type could not occur in an area extending clockwise from 9:00 o'clock to 4:30 unless in the area between 4:30 and 9:00 o'clock was intact or unless the compressions were produced by impact as in the case of the aircraft striking the water. All of the mentioned tears have remained in position as cracks as if made by compression and are not pulled apart in extension as might be the case if fractured in tension. These cracks progress clockwise and counter-clockwise and could not have occurred if the principal fracture had propagated progressively from each end of the alleged fatigue fracture.

In addition to the above we have considered the fact that fatigue failures occur as a result of oscillatory loading and from the evidence presented it appeared that such failure does not occur instantaneously. As to the exact propagation rate of a fatigue crack in this particular metal at this particular location on the tailboom under the particular conditions to which it is subjected on August 15, 1967, there was no evidence on which to base a definite determination. Defendants' experts were unanimous in their opinion that such fractures propagated very slowly, are easily discernible and should be detected by any routine inspection. This conclusion was denied but not really refuted by plaintiffs' experts. Adams, plaintiffs' (and Mobil's) most qualified metallurgist, stated as follows:

> "Now the growth of the crack is a very slow process in which each application of load; as was testified to yesterday, each application of load

---

2. The degrees of compression mentioned herein refer to a bending of so many degrees from the original straight (180°) longitudinal plane of the original structure of the monocoque tailboom looking aft.

causes the crack to propagate a little bit. It is a stop-and-go type of thing. Between load applications, the limit of the crack is standing still. During load applications, it moves a little bit further." (Tr. pp. 755–756).

Plaintiffs and Mobil introduced thirteen customer service orders sent in to Bell by its Field Representatives from February 1, 1967 thru September 15, 1968 disclosing the occurrence of cracks in various parts of the magnesium monocoque tailbooms of other 206A Jet Ranger Helicopters then in the field. In all of these cases the cracks had propagated at such a slow rate as to allow discovery on routine daily examination and inspection as was maintained by Mobil.

No less than four of Bell witnesses qualified in metallurgy in the operational experience of magnesium monocoque tailbooms were of the definite opinion that if there were no cracks in the tailboom of the N7846S at 1:50 P.M. on the date of the accident and if this aircraft were in operation until approximately 3:30 or 4:00 P.M. that no such crack would possibly nucleate, propagate and go to complete failure during that short period. The inspection at early morning and the inspection by Long and the mechanic just prior to takeoff at 1:50 P.M. have been fixed by Mobil witnesses. The fact that there was no existing crack in the tailboom in the area immediately in the rear of the horizontal stabilizer in the lower left hand quadrant looking aft was established by the fact that Mobil was aware that some of the 206A Bell Jet Rangers were experiencing fatigue cracks in various areas of the tailboom. Because of this notice the mechanics and pilots were "religiously" inspecting the tailboom area for any signs of cracking. The area where this crack would have had to originate according to plaintiffs' metallurgical experts would have been in clear view and discoverable upon inspection. We find that the evidence clearly establishes that the fracture alleged by plaintiffs' (and Mobil's) expert witnesses could not have nucleated, propagated and gone to complete failure during that short period.

Bell has described the fractures referred to in the customer service orders as maintenance nuisance, and handled them as such. The record supports this conclusion. Its customers without exception handled them as a maintenance nuisance. The monocoque tailboom (aluminum) is certainly an accepted commodity on the present market. Petroleum Helicopters, Inc. was operating more than seventy of such aircraft at the time of the trial. Of the thirteen aircraft with magnesium booms referred to in the customers service orders, not one was grounded, not one crashed.

The stability of the magnesium monocoque tailboom is demonstrated by the Bell 206A Jet Ranger belonging to ERA. Photographs of the tailboom of this aircraft are in the record and it was the subject of a customer service order dated August 22, 1968. This craft operated despite a crack which ran more than 180° around the circumference of the tailboom. The remaining unfractured metal of this 206A tailboom was sufficient to withstand the loads applied in the operating of that helicopter.

All the rest of the evidence regarding the liability of Bell is predicated upon the proof of an occurrence of a fatigue fracture in the tailboom of the N7846S. The testimony of plaintiffs' (and Mobil's) own witnesses establishes that there was no such fracture existing at 1:50 P.M. on the day of the accident. There is no evidence to indicate the existence of such a fracture thereafter, except the disputed conclusions of the two metallurgists called by plaintiffs and Mobil. Their conclusions are not supported by the other evidence in the case. They are disputed by Bell's witnesses and refuted by the physical evidence above referred to. The evidence does not establish that a fatigue fracture occurred in the tailboom of the N7846S or that the tailboom became separated from the helicopter in flight prior to the accident of August 15, 1967.

■ The claims against Bell as manufacturer made by the plaintiffs and the third party plaintiff must fall without evidence to support a conclusion that any factor of design or manufacturing technique caused or contributed to the uncontrolled descent of the helicopter. Bell had neither the management of nor control over the operation or maintenance of the unit once it was delivered to Mobil.

The evidence is not sufficient to establish that an inflight separation of the tailboom caused the crash of Mobil's Jet Ranger. In fact, evidence is so insufficient that no actual, probable or suggestive cause of the crash cannot be determined with any degree of certainty.

The focus of attention must turn to a determination of liability, if any, on the part of the only remaining defendant, Mobil, the owner and operator of the 206A Jet Ranger.

■ The plaintiffs seeking recovery from Mobil have, in addition to listed specific acts of negligence, sought to invoke, either by clear implication or by actual pleading, the doctrine of res ipsa loquitur. This doctrine unquestionably has application in a cause of action arising in admiralty, either under the Jones Act or under the General Maritme Law. American Commercial Lines, Inc. v. Silver Creek Coal Co., 393 F.2d 178 (7th Cir. 1968), held as follows:

"Appellant argues that it is entitled to recover under the doctrine of res ipsa loquitur. Unquestionably that doctrine has application in admiralty. Johnson v. United States, 333 U.S. 46, 68 S.Ct. 391, 92 L.Ed. 468 (1948); United Fruit Company v. Marine Terminals Corporation, 9 Cir., 376 F.2d 1007 (1967); Logan Charter Service, Inc. v. Cargill, Inc., 8 Cir., 373 F.2d 54 (1967). However, "res ipsa loquitur means that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; that they furnish circumstantial evidence of negligence where direct evidence of it may be lacking, but it is evidence to be weighed, not necessarily to be accepted as sufficient * * *.' Sweeney v. Erving, 228 U.S. 233, 240, 33 S.Ct. 416, 418, 57 L.Ed. 815 (1913). And see Johnson v. United States, supra; United Fruit Company v. Marine Terminals Corporation, supra. Even if the doctrine were applicable, the court's findings are not clearly erroneous, particularly in light of the direct evidence of proper unloading by appellee."

*See also* Johnson v. United States, 333 U.S. 46, 68 S.Ct. 391, 92 L.Ed. 468 (1948); United Fruit Co. v. Marine Terminal Corporation, 376 F.2d 1007 (9th Cir. 1967); Logan Charter Service, Inc. v. Cargill, Inc., 373 F.2d 54 (8th Cir. 1967).

There appears little doubt that the jurisprudence developed on this doctrine has been applied to actions involving aircraft accidents. Cox v. Northwest Airlines, Inc., 379 F.2d 893 (7th Cir. 1967).

In *Cox* the District Court was unable to identify any specific conduct on the part of the defendant which constituted negligence and which was a proximate cause of the disaster, but in reviewing the findings of fact and conclusions of law filed by the District Court, the 7th Circuit affirmed, saying:

"We are of the opinion that the Court properly applied the doctrine of res ipsa loquitur and that its findings of negligence was a permissible one . . . .". Cox v. Northwest Airlines, Inc., supra, p. 895).

Although not completely determinative of either liability or causation, the Court feels that some subsidiary findings of fact should be made as a backdrop for the ultimate conclusions.

From the testimony of both the men on the Baxter rig from which the helicopter departed and from the testimony of the pilot who spotted the wreckage, it appears that the weather at the time of the crash and shortly thereafter was overcast with a very light rain falling. Seas in the area were whitecapped at

about three to five feet. Mr. Bodin, a workman on board the Baxter rig present when the Jet Ranger made its last takeoff, stated that in his experience helicopters did not routinely move about in the offshore fields in such drizzles. Although there exists a certain amount of doubt as to the extent of the light rain, there is no question in the Court's mind that it was not a "nice, warm, sunny day" at the location of the crash.

Inasmuch as Mobil performed its own maintenance on the 206A, the extent and quality of their program was deeply explored. The chief pilot and mechanics supervisor for Mobil, Mr. Rhodes, testified that he had personally flown this particular 206A on the morning of the crash, and at that time he had no indication of any problem or potential problem with the aircraft. When Rhodes last saw the aircraft it was being inspected by Mr. Long, the pilot, and a mechanic. In addition, he stated he had personally inspected the craft on that date and found nothing wrong with the Jet Ranger. This inspection included a "religious" inspection of the tailboom in the area of the horizontal stabilizer. The detailed inspection of this area had for its purpose the detection of cracks in the magnesium skin. Rhodes stated that his company had heard of some tailboom cracking on this model helicopter experienced by Petroleum Helicopters, Inc. As a result of this knowledge extra care was being taken to check this area.

Much of the testimony regarding the strict maintenance procedures is disputed by the information shown on the mechanics' worksheets. According to these records, untrained mechanics were servicing the helicopters prior to the accident of August 15. The pilot trip reports are not creditable. If the information on these trip reports was accepted as true, it would show that this helicopter was habitually flown "over the red line" and at speeds substantially over the "VNE" (velocity never to exceed) limit for this model.

From the evidence presented it appeared that Joseph C. Long, the pilot, had a propensity for flying at extremely low altitudes, that is, under 25 feet. This fact was brought out by testimony of men who had flown with Long in the past. Prior to his employment with Mobil, Long had occasion to crash a helicopter owned by his then employer, Petroleum Helicopters, Inc. In that crash it seems that Long was chasing ducks with the helicopter at extremely low altitude when some ducks went through the bubble of the helicopter causing it to crash. Long and his passengers walked away from that incident.

There is no definite proof, and in fact nothing short of pure speculation as to the altitude of the 206A Jet Ranger at the onset of its uncontrolled descent.

These findings and observations on the evidence are not such specific conduct as could enable this Court to proclaim any one or all to be a cause in fact of the crash. For the Court to do so would be an exercise in speculation. The conclusion remains that the cause of the crash is unexplained.

"The appellant recognizes that the doctrine of res ipsa loquitur may properly have application in actions involving airline accidents. But the appellant contends that in the instant case it was error to apply that doctrine in resolving the issue of liability because there is substantial proof of the exercise of due care by the appellant and no countervailing evidence of specific negligence or even of unusual circumstances. Appellant urges that evidence of due care on its part precludes any inference of negligence arising from the occurrence in the absence of at least minimal supporting evidence and, therefore, libellant has not sustained the burden of proof requisite to an ultimate finding of negligence and has failed to prove her case by a preponderance of the evidence.

The evidence of due care to which appellant alludes concerns its maintenance records and procedures with re-

spect to the aircraft involved; the qualified and certified status, and the competence, of the operating personnel of the aircraft and of the dispatcher; the safety training received by the crew; and the evidence that the flight was properly dispatched and the weather normal.

There is no evidence as to the cause of the aircraft's crash into the ocean or concerning what happened to affect the operation of the aircraft during the period following 11:07 A.M. and prior to the crash. In the absence of such evidence, the probative value of appellant's general evidence of due care is not of substantial import. Whether due care was exercised by the operating personnel of the aircraft in the face of whatever occurred to affect the operation of the aircraft can be appraised only in the light of knowledge of what that occurrence was, whether human or mechanical failure or some other incident, and of what if anything was or could have been done about it." Cox v. Northwest Airlines, supra, p. 895).

■ The doctrine of res ipsa loquitur affords an inference that there was in fact some negligence simply from the occurrence of an unexpected and out of the ordinary event. There has been no specific negligent action or inaction on the part of Mobil to which the Court can label a contributing factor in this crash.

■ Mobil had the exclusive control and management of the instrumentality. Such incidents as this crash do not ordinarily occur in the absence of negligence. There is no evidence that any action on the part of Marshall K. Higginbotham, J. L. Shinn or James E. Nation contributed in any manner to the unexplained crash.

The Court finds as a matter of law that the doctrine of res ipsa loquitur in the light of the total effect of the evidence, affords a reasonable inference of fault and is properly applicable to the facts of this litigation.

No claim has been made by the representatives of Joseph C. Long, Jr., the pilot, against his employer, Mobil. There remains, in view of the preceding conclusions, the task of identifying the legal status of the three passengers who lost their lives and determining the law which must govern the recovery, if any, due their survivors.

## MARSHALL K. HIGGINBOTHAM

Marshall K. Higginbotham was a toolpusher for Baxter Drilling Company on a submersible drilling barge. He was not employed by Mobil and had only the status of an invitee on Mobil's 206A Jet Ranger at the time of the fatal accident on August 15, 1967. Recovery is sought by his wife and minor daughter under the General Maritime Law, Death on the High Seas Act, 46 U.S.C. § 761 et seq., and the Louisiana Wrongful Death Act, La.Civ.Code Art. 2315.

■ The fatal accident occurred on the high seas covering the Outer Continental Shelf approximately 100 miles off the coast of Louisiana. There is no question of Mobil's liability under the Death on the High Seas Act. Cox v. Northwest Airlines, Inc., 379 F.2d 893 (7th Cir. 1967), cert. denied 389 U.S. 1044, 88 S.Ct. 788, 19 L.Ed.2d 836, and Dugas v. National Aircraft Corporation, 438 F.2d 324 (3 Cir. 1970).

■ Mobil is also liable under the General Maritime Law. Mobil's Jet Ranger No. 46 was utilized primarily to serve Mobil's offshore oil and gas operations. It was engaged in such services on the day of the accident, performing the mission of a crewboat in transferring passengers, etc., between the shore and several offshore rigs. The Jet Ranger was engaged in maritime activity at the time of the accident of August 15, 1967, Executive Jet Aviation v. Cleveland, *supra,* and a remedy is found in Maritme Law for injuries or death resulting therefrom. Kermarec v. Compagne Genereale Transatlantique, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959); Moragne v. United States Lines,

Inc., 398 U.S. 375, 90 S.Ct. 1772, 26 L. Ed.2d 339 (1970). There is dicta in several cases indicating that the wrongful death remedy outlined in *Moragne, supra,* might be limited to state territorial waters and that D.O.H.S.A. preempts the field outside that area. Canal Barge Co., Inc.. v. Griffin, 480 F. 2d 11 (5th Cir. 1973). However, the language of *Moragne, supra,* itself clearly establishes that the action of wrongful death exists in General Maritime Law and there is no indication (even though the accident in that case occurred in the territorial waters of Florida) that the remedy is limited to the territorial waters of the states. The Court stated specifically that the primary source of confusion was not The Tungus v. Skovgaard, 358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524 (1959), which utilized applicable state wrongful death statutes in such waters, but The Harrisburg, 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358 (1886), which held that no action for wrongful death existed in the General Maritime Law:

> "The extent of the role to be played by state law under The Tungus has been the subject of substantial debate and uncertainty in this Court, see Hess v. United States, 361 U.S. 314, 80 S.Ct. 341, 4 L.Ed.2d 305 (1960); Goett v. Union Carbide Corp., 361 U. S. 340, 80 S.Ct. 357, 4 L.Ed.2d 341 (1960), with opinions on both sides of the question acknowledging the shortcomings in the present law. See 361 U.S., at 314–315, 338–339, 80 S.Ct. 341, 4 L.Ed.2d at 305, 308, 321. On fresh consideration of the entire subject, we have concluded that the primary source of the confusion is not to be found in The Tungus, but in The Harrisburg, and that the latter decision, somewhat dubious even when rendered, is such an unjustifiable anomaly in the present maritime law that it should no longer be followed."

See also Sennett v. Shell Oil Co., 325 F. Supp. 1 (E.D.La.1971).

The claim under the provisions of Louisiana Civil Code Article 2315 is denied. Sennett v. Shell Oil Co., *supra*; In Re Farrell Lines, Incorporated, 339 F. Supp. 91 (E.D.La.1971). Thus the representatives of Higginbotham are entitled to recover under the General Maritime Law and under the Death on the High Seas Act.

## JAMES L. SHINN

The representatives of Shinn seek recovery under the Jones Act, Death on the High Seas Act, the General Maritime Law and the Laws of Texas. Their claim under Texas law is dismissed since this claim was directed against defendant Bell who has been dismissed.

■ Shinn was an employee of Mobil and a toolpusher on one of its drilling barges. Mobil has stipulated that he was a member of the crew of that vessel but contests his seaman's status on the ground that he was not in the service of a vessel at the time of his death. We find that Mobil's contention is not sustained by the evidence. Mobil's barge on which Shinn served as a toolpusher was located some 100 miles at sea. Mobil does not pretend that Shinn was to transport himself to or from the rig. It is undisputed that Mobil's personnel were transported to and from the rigs by Mobil and that Mobil assumed the duty to provide such transportation to Shinn. Mobil did in fact control, own and provide such transportation and was in the act of providing such transportation, namely, Mobil's ill-fated 206A Jet Ranger, when Shinn met his death. During this transportation phase of his employment, Shinn was clearly "in the course of his employment" so as to render Mobil liable under the Jones Act. Hopson v. Texaco, Inc., 383 U.S. 262, 86 S.Ct. 765, 15 L.Ed.2d 740 (1966). See also Comment, 46 Tul.L.Rev. 877 (1972).

■ Shinn's death gives rise to a cause of action under the Death on the High Seas Act as well as the Jones Act. The valid claim by Jones Act plaintiffs

will not affect the legality of the claim by plaintiffs under D.O.H.S.A. Doyle v. Albatross Tanker Corp., 260 F.Supp. 303 (D.C.N.Y.), aff'd, 367 F.2d 465 (2 Cir. 1965); Guirtsman v. Western King Co., 263 F.Supp. 633 (D.C.Cal.1967); Petition of Risdal & Anderson, Inc., 291 F. Supp. 353(D.C.Mass.1968).

The next question is whether the Shinn plaintiffs can sue his employer, Mobil, under the General Maritime Law.

The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903) has been cited universally as authority for the doctrine that a seaman may not sue his employer under the General Maritime Law for injuries resulting from the employer's negligence as distinguished from unseaworthiness. This case established the so-called void which was filled later by the passage of the Jones Act. But the holding is not so broad as generally imagined.

■■■ The doctrine of *The Osceola* finds its basis in the fellow servant rule and should be restricted to instances in which a member of the crew of the vessel is injured by the negligence of another crew member of the same ship. The court in *The Osceola* declared:

"Upon a full review, however, of English and American authorities upon these questions, we think the law may be considered as settled upon the following propositions:

1. . . . (maintenance and cure) . . .

2. . . . (unseaworthiness) . . .

3. That all the members of the crew, except, perhaps, the master, are, as between themselves, fellow servants, and hence seamen cannot recover for injuries sustained through the negligence of another member of the crew beyond the expense of his maintenance and cure.

4. That the seaman is not allowed to recover an indemnity for the negligence of the master, or any member of the crew, but is entitled to mainte-nance and cure, whether the injuries were received by negligence or accident."

■■■ Shinn was not the fellow servant of every worker in the Gulf employed by Mobil. Certainly he was not the fellow servant of Nation or Long who were also employees of Mobil. Shinn was Mobil's toolpusher on the Pinrod Drilling Barge 50 and his fellow servants consisted of the crew of that drilling barge. The 206A Jet Ranger was performing services ordinarily performed by a crewboat and Shinn had no identification whatsoever with the Ranger. Under the circumstances, neither Long, Higginbotham nor Nation was a fellow servant of Shinn. Since the prohibition of *The Osceola* does not apply, there is a cause of action under the General Maritime Law.

■■■ Shinn's remedies under the Jones Act are not exclusive. His collateral remedy at Maritime Law may be had where appropriate as in the traditional instance of unseaworthiness. *Moragne, supra; Sennett, supra.* We therefore find that in addition to having an action under the Jones Act, the representatives of Shinn also have a cause of action under the General Maritime Law and under the Death on the High Seas Act.

## JAMES E. NATION

■■■ The representatives of Nation seek to recover under La.Civ.Code Art. 2315, the Death on the High Seas Act, the Jones Act and the General Maritime Law. We find that Nation's exclusive remedy against his employer, Mobil, is the Longshoremen's and Harbor Workers Compensation Act, 33 U.S.C. § 901 et seq. This coverage applies to him under the provisions of the Outer Continental Shelf Lands Act, 43 U.S.C. § 1333(c).

At the time of his death on the 206A Jet Ranger Nation was employed by Mobil as a toolpusher on a stationary platform Baxter Rig No. 3. His claim to

seaman's status is based on the assertion that he was temporarily on the stationary platform and that his regular employment was on submersible drilling barges owned by Mobil. However, the evidence fails to identify him with any such barge except the Crestwave Topper No. 1 which was not under the control of Mobil at the time of the accident. It had been released by Mobil more than two weeks prior thereto. We find as a matter of fact that Nation was not assigned to a drilling barge, that he was attached to Mobil's stationary platform, that as a matter of law his seaman's status is determined by the situs of his work at the time of his injury and that he was not therefore a seaman on the date of his death. Desper v. Starved Rock Ferry Co., 342 U.S. 187, 72 S.Ct. 216, 96 L.Ed. 205 (1952). *See also,* Parker v. Motor Boat Sales, Inc., 314 U.S. 244, 62 S.Ct. 221, 86 L.Ed. 184 (1941); Flowers v. Travelers Ins. Co., 258 F.2d 220 (5th Cir. 1958).

The waters over the Continental Shelf are "high seas". 43 U.S.C. § 1332. We find that Nation's status under the Longshoremen's Act is not altered by the fact that his death occurred while he was being transported aboard Mobil's helicopter on the high seas some distance from the stationary rig. Section 1333(a) of the Outer Continental Shelf Lands Act, in declaring that the laws of the adjacent states shall apply as federal law, refers specifically to "that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon". However, Section 1333(b) uses much broader language in referring to the jurisdiction of the United States District Courts:

"The United States district courts shall have original jurisdiction of cases and controversies arising out of or in connection with any operations conducted on the outer Continental Shelf for the purpose of exploring for, removing or transporting by pipeline the natural resources, or involving rights to the natural resources of the subsoil and seabed of the outer Continental Shelf, and proceedings with respect to any such case or controversy may be instituted in the judicial district in which any defendant resides or may be found, or in the judicial district of the adjacent State nearest the place where the cause of action arose."

The geographic area of the district court's jurisdiction is much broader under Section 1333(b) than the specific subsoil, seabed and artificial structures referred to in Section 1333(a). Congress obviously intended in Section 1333(c), in making the provisions of the Longshoremen's and Harbor Workers' Compensation Act applicable to employees' death or disability "occurring as a *result of operations described in subsection (b)* of this section", that an employee's status and his coverage under the Act would not be subject to continuous and instant traffic-light (seaman to worker-worker to seaman) alterations as his duties might take him on and off the particular platform to which he was attached. Bertrand v. Forest Corp., 441 F.2d 809 (5th Cir. 1971); Nalco Chemical Corp. v. Shea, 419 F.2d 572 (5th Cir. 1969); Reagan Equipment Co. v. Donovan, 296 F.Supp. 535 (E.D.La.1968). The Act envisions that the offshore platform employees have the assured protection of the compensation act. If Congress intended that status of such workers should not be job-related but simply site-related so that his status changed every time he stepped off the platform, the language of the Outer Continental Shelf Lands Act would have reflected this intent. As stated previously, the act does not provide that the Longshoremen's Act shall apply to disability or death resulting from any injury on a platform. It provides that the Longshoremen's Act shall apply to disability or death "resulting from any injury occurring as the result of operations described in subsection (b) of this section" which is quoted in full above. We find, therefore, that Nation's exclusive

remedy is the Longshoremen's Compensation Act.

We hold therefore that all demands against defendant and third party defendant Bell be dismissed, that the claims of the representatives of Nation against Mobil be dismissed without prejudice to their rights under the Longshoremen's and Harbor Workers' Compensation Act, and that there be judgment in favor of the representatives of Higginbotham and against Mobil under the Death on the High Seas Act and the General Maritime Law and in favor of the representatives of Shinn against Mobil under the Jones Act, the Death on the High Seas Act and the General Maritime Law.

We recognize that the jurisprudence regarding quantum particularly under the General Maritime Law has undergone stages of development and change which require the submission of additional authorities. The rendition of formal judgment will be deferred until such authorities have been submitted and considered.