Tim L. **CAMPBELL** et al., Plaintiffs,

v.

**FIRST NATIONAL BANK IN ALBU-QUERQUE, N. M., et al., Defendants.**

Civ. No. 9903.

United States District Court,
D. New Mexico.

Nov. 29, 1973.

William G. Gilstrap, Albuquerque, N. M., and Tom H. Davis, Austin, Tex., for plaintiffs.

John P. Eastham, Albuquerque, N. M., for defendants.

## OPINION AND ORDER

PALMIERI, District Judge.*

### Preliminary Statement

These are five wrongful death actions which stem from the fatal crash of a private airplane near the town of Mogollon, New Mexico, on June 22, 1972. The plaintiffs, residents of Colorado, are representatives or executors of the estates of the five deceased passengers. The defendants, residents of New Mexico, are co-executors of the deceased pilot, Henry S. Birdseye. The crucial claim in this diversity suit, 28 U.S.C. § 1332, made by the plaintiffs is that Birdseye negligently piloted the plane and thereby caused the crash.

Birdseye was an experienced pilot with over 2,000 hours of flight time and a commercial pilot's license. He was a professional geologist as well, and his passengers were either mining engineers or geologists. Their flight from Albuquerque, New Mexico, to the Glenwood-Catron County, New Mexico, airport was without incident and the group spent the afternoon in the area on mining business. At about 6:15 P.M., the aircraft took off from the Glenwood-Catron County airport in good weather and adequate visibility. An eyewitness, himself an experienced pilot, observed the take-off and saw the plane disappear from view about six minutes later, headed north in the general direction of Mogollon, New Mexico. Their flight destination was the town of Truth or Consequences, New Mexico, approximately due east of the Glenwood airport. At approximately 6:30 P.M., and about nine minutes after the plane disappeared from view, it crashed into the north slope of an east-west canyon some nine miles from the airport.

The plaintiffs have made much of the allegedly dangerous terrain around the Glenwood airport and particularly the east-west canyon in the direction in which the plane was headed. They have attempted to show that the pilot unsuccessfully tried to clear the north slope of the canyon and crashed because of his "stalling" the plane in this endeavor. Alternatively, they seek recovery on the basis of the doctrine of *res ipsa loquitur* as applied to airplane crashes.

The record is barren of any demonstrable proof of what occurred after the aircraft disappeared from view. Except for the time and location of the crash, everything else relating to the fatal accident is a matter of conjecture and speculation. The scant evidence gathered at the crash site, at which fire followed impact, revealed nothing concerning the course and position of the plane or the

* Of the Southern District of New York, sitting by designation.

actions of the pilot immediately before the crash.

It is beyond dispute that in the time from takeoff to the crash the plane, as loaded and fueled, could have reached an altitude of substantially more than 11,000 feet, m. s. l., an altitude safely above the north ridge of the canyon. Nor has any reason been suggested as to why the pilot would be trying to clear the north ridge at the point of the accident. The pilot had a choice of lower terrain, both to the north and to the south; and in the canyon itself, which was approximately two miles wide, there was more than enough space for a 180° turnabout. Mr. Wilson Hurley, the defendants' expert, whose testimony the Court finds to be both credible and persuasive, gave a number of hypothetical reasons that could have been causally related to the accident without any negligence on the part of the pilot, all of them consistent with the known facts.

The Court rejects the plaintiffs' assertion that the doctrine of *res ipsa loquitur* should apply. The state courts of New Mexico have not passed upon the question of the doctrine's application to airplane accidents and we are therefore given no guidance as to what course should be followed in this regard. The leading case in this field appears to be Cox v. Northwest Airlines, Inc., 379 F. 2d 893 (7th Cir. 1967); *see also* Annot., Res ipsa loquitur in aviation accidents, 6 A.L.R.2d 528 (1949). In *Cox*, the Seventh Circuit held that *res ipsa loquitur* could apply in an action under the Death on the High Seas Act, 46 U.S.C. § 761 et seq., brought against an airline company. It is nevertheless clear that the holding in *Cox* does not *require* the doctrine's application for the Court there stated:

> "We are of the opinion that the court properly applied the doctrine of res ipsa loquitor and that its finding of negligence was a *permissible one— warranted though not compelled* . . . ." (emphasis added). 379 F.2d at 895.

The New Mexico courts have had occasion to define the requisite elements for the doctrine's application in general. In Hisey v. Cashway Supermarkets, Inc., 77 N.M. 638, 426 P.2d 784, 785 (1967), the New Mexico Supreme Court stated:

> "The factual basis necessary as a premise for application of res ipsa loquitur requires proof that (1) plaintiff's injury was proximately caused by an agency or instrumentality under the exclusive control of the defendant; and (2) the incident causing the injury is of the kind which ordinarily does not occur in the absence of negligence by the person having control of the instrumentality."

■ We do not question the plaintiffs' assertion that under the applicable federal regulations Birdseye, as "pilot in command," was "directly responsible for, and is the final authority as to, the operation of that aircraft." 14 C.F.R. § 91.3(a) (1973). This does not, however, compel the conclusion that the airplane was under his exclusive control. He had rented it on the morning of the crash from Southwest Air Rangers, Inc., of Albuquerque, New Mexico, which, presumably, although no evidence of this was introduced at trial, was "responsible" for its maintenance, safety inspections and the like. As the New Mexico Supreme Court stated in *Hisey, supra*, at 785, "more than the happening of an accident is necessary to invoke the res ipsa loquitur doctrine." Similarly, that Court stated the rule, which is applicable here, to be that:

> "The absence of any evidence, or reasonable inference to be drawn from evidence that this accident is the kind which ordinarily does not occur in the absence of the negligence of *someone alone* defeats the application of the doctrine . . ." (emphasis added) 426 P.2d at 786.

■ Without deciding whether, because approximately 83% of all general aviation accidents are attributable to "pilot error," National Transportation Safety Board, Aircraft Design-Induced

Pilot Error (1967), this accident may or may not be of "the kind which ordinarily does not occur in the absence of negligence of someone," Hisey v. Cashway Supermarkets, Inc., *supra*, at 786, the conclusion is inescapable that the requisite control over the airplane, in its mechanical as well as directional aspects, has not been sufficiently demonstrated to permit the doctrine of *res ipsa loquitur* to apply.

As the New Mexico courts have reaffirmed, "(e)vidence equally consistent with two hypotheses tends to prove neither." Tapia v. McKenzie, 85 N.M. 567, 514 P.2d 618, 621 (1973); Stambaugh v. Hayes, 44 N.M. 443, 103 P.2d 640, 645 (1940). "Further, the maxim of res ipsa loquitur does not apply to the case of death in an airplane accident where the evidence fails to supply any proof as to the exact or proximate cause of the accident." Kelley v. Central Nat'l Bank of Richmond, 345 F.Supp. 737, 741 (E.D.Va.1972). Such cases as Cox v. Northwest Airlines, Inc., 379 F.2d 893 (7th Cir. 1967), upon which the plaintiffs place much reliance are not applicable where the defendant did not have exclusive control of the airplane, as here. *Cf.* Kelley v. Central Nat'l Bank of Richmond, *supra*, at 741, where the district court distinguished these cases on the ground that they applied to professional, as opposed to private pilots, a distinction which appears to be without merit in view of 14 C.F.R. § 91.3(a) (1973), and which we do not rely upon.

The Findings of Fact and Conclusions of Law which follow are intended to amplify and supplement what has already been said and to demonstrate that the plaintiffs have failed to prove that the pilot, Birdseye, was negligent or that any negligence of the pilot was proximately or causally related to the crash. It necessarily follows that judgment must be awarded to the defendants.

## FINDINGS OF FACT

1. Henry S. Birdseye, a commercially-licensed pilot with over 2,000 hours of flight time, rented a Piper, single engine aircraft, model PA–32–300 ("Cherokee Six"), Registration No. N–4278R, from Southwest Air Rangers, Inc., in Albuquerque, New Mexico, on June 22, 1972. Before flying the plane on his own responsibility he was given a 45 minute checkout on the Owner's Handbook for the plane and then had a .9 hour flight checkout, including five takeoffs and landings, minimum controllable air speed flight with and without flaps, steep turns, slow turns, and stalls, with and without flaps.

2. Birdseye had flown this model of airplane before and the owner of Southwest Air Rangers, Inc., felt that Birdseye could safely handle the aircraft rented to him on June 22, 1972. The owner of Southwest Air Rangers, Inc., talked with Birdseye a day or two before the accident and they discussed the terrain around the Glenwood-Catron County (Glenwood) airport. Birdseye indicated that he would take necessary precautions. Birdseye had flown into the Glenwood airport three times prior to June 22, 1972. Birdseye was a careful pilot and a pilot friend, Wilson Hurley, allowed his children to fly with Birdseye after he himself had flown with Birdseye to ascertain his flying judgment and competence.

3. After being checked out on the airplane, Birdseye left Albuquerque, New Mexico, and flew to the Glenwood airport with five passengers on board the aircraft: John Harrison, John Kent Perry, Harold Renfro, William B. Miller and Larry Hammond. Birdseye was the pilot in command of the airplane at all times pertinent to this lawsuit. Upon landing at the Glenwood airport, they were met at about noon by Ira M. Young, a mining engineer. Birdseye was a professional geologist and his passengers were either geologists or mining engineers. The group spent the afternoon looking at mining properties in the area.

4. They returned to the airport at Glenwood late in the afternoon. In preparation for their intended flight to

Truth or Consequences, New Mexico, Birdseye checked the weights of all passengers and the ore samples which they were carrying with them on the plane. The weight and balance of the airplane were within limits as John Kent Perry, one of the passengers, had computed these figures on a digital computer he had with him. The gross weight of the aircraft at takeoff was approximately 3,200 pounds, 180 pounds under the aircraft's permissible maximum takeoff weight.

5. The plane took off at about 6:15 P.M. towards the south, flew approximately 3 miles, then made a 180° turn and headed north towards the town of Mogollon. It climbed over Windy Point, which rises from 6,000 feet, m. s. l., making a slight left turn apparently to avoid the canyon walls, and then disappeared from the view of the only witness, Ira M. Young. It took not over six minutes from the time the plane took off until it disappeared from Mr. Young's view. The flight was bound for Truth or Consequences, New Mexico, which is approximately due east of the Glenwood airport.

6. The airplane's course after it disappeared from Mr. Young's view is unknown.

7. According to the times indicated on some of the passengers' stopped watches, the plane crashed at approximately 6:30 P.M. The location of the crash was on the north side of an east-west çanyon, some nine miles from the Glenwood airport and some 6½ miles to the east of Windy Point; this was at a point below the north ridge of the canyon, which rises up to an elevation of approximately 9,500 feet, m. s. l., at approximately 8,200 feet, m. s. l. The plane crashed on a northernly heading (which was not its course to Truth or Consequences) into a 45° slope, descending in a nose-down attitude at a 45° angle, so that the impact was virtually at 90°. The plane was demolished on im-

pact and by the fire which occurred at the crash site following impact. All of its occupants were found dead at the site.

8. The plane's wing flap control was found in the "flaps' retracted" position. It appears that virtually all of the aircraft's component parts were found in the immediate area of the crash in a state of disintegration. The National Transportation Safety Board (N.T.S.B.) examiner, Mr. Martin, stated that the airplane's controls, other than the flap control, were so destroyed that no factual determination could be made based on the controls.

9. According to the N.T.S.B. report on the crash, the aircraft had flown 716 hours as of June 12, 1972, and as of the same date had flown 43 hours since its last inspection on April 17, 1972; its last periodic inspection was in October of 1971.

10. From the state of the propellor found at the crash site, it is more probable than not that the plane was under power when it crashed. The airplane was equipped with a "stall" warning light.

11. The weather at takeoff was overcast but the peaks of the mountains were not obscured. The overcast was between 11,000 and 12,000 feet, m. s. l. There was a thunderstorm some 40 to 50 miles to the northwest and a small rain shower some 20 to 25 miles to the south. The prevailing wind at Glenwood airport was from the south at approximately 5 knots. The temperature at the crash site at the time of crash was approximately 65° Fahrenheit and the density altitude was approximately 10,420 feet, m. s. l.

12. The aircraft Owner's Handbook on board the plane contained a chart showing rate of climb in proportion to density altitude which, under the approximate conditions existing at the time of the crash would have been 430

feet per minute, with 10° flaps extended and an airspeed of 105 knots. The "Minimum Safe Altitude" prescribed by 14 C.F.R. § 91.79 (1973) for this type of uncongested area is "over 500 feet above the surface." Had the aircraft been in the canyon immediately prior to the crash there would have been ample space in which a 180° turn could have been executed.

13. The cause of the crash is unknown and any possible explanations for the cause are necessarily hypothetical speculations.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and of the subject matter. 28 U.S.C. § 1332(a).

2. The plaintiffs have failed to sustain their burden of proving by a preponderance of the evidence that the proximate cause of the crash was the negligence of the pilot, Henry S. Birdseye. "Evidence equally consistent with two hypotheses tends to prove neither." Tapia v. McKenzie, 85 N.M. 567, 514 P. 2d 618, 621 (1973); Stambaugh v. Hayes, 44 N.M. 443, 103 P.2d 640, 645 (1940).

3. The Court is unable to ascertain the cause of the aircraft's crash with any reasonable degree of probability, there being many possible causes.

4. The doctrine of *res ipsa loquitur* in tort does not apply in this case. Hisey v. Cashway Supermarkets, Inc., 77 N.M. 638, 426 P.2d 784, 785 (1967); Cox v. Northwest Airlines, Inc., 379 F. 2d 893, 895 (7th Cir. 1967); Kelley v. Central Nat'l Bank of Richmond, 345 F. Supp. 737, 741 (E.D.Va.1972).

5. Judgment should be entered for the defendants and against the plaintiffs.

Accordingly, it is hereby ordered that judgment be entered on behalf of the defendants dismissing this lawsuit. It is further ordered that the parties shall bear their own costs. Fed.R.Civ.P. 54(d).