## MORRISON v. LE TOURNEAU CO. OF GEORGIA et al.

## LE TOURNEAU CO. OF GEORGIA et al. v. MORRISON.

### No. 10587.

Circuit Court of Appeals, Fifth Circuit.

Oct. 27, 1943.

Alex W. Smith and Croom Partridge, both of Atlanta, Ga., and Walter P. Armstrong, of Memphis, Tenn., for appellant and cross-appellee.

A. C. Wheeler, of Gainesville, Ga., and Clifton W. Brannon and C. M. McClure, both of Toccoa, Ga., for appellees and cross-appellant.

Before SIBLEY, HOLMES, and WALLER, Circuit Judges.

WALLER, Circuit Judge.

Out of the fog, mists, and clouds that enshrouded Beaverdam Mountain on the morning of August 19, 1940, a little two-place, dual-controlled cub plane plunged to earth. In its wreckage were the lifeless and mangled bodies of two young men. One, Alton Vance Morrison, was the plaintiff's intestate. The other, Don Phillip LeTourneau, was the pilot of the plane.

Beaverdam Mountain is in the Sandy Mush Gap settlement in North Carolina, near the Buncombe County line.

Asserting a right to maintain the action under the death-by-wrongful-act statute of North Carolina, the administrator of Morrison's estate sued Toccoa Falls Flying School, Inc., as the owner and lessor, and LeTourneau Company, of Georgia, as the lessee and operator, of the fallen plane. The plane on the occasion was, and frequently theretofore had been, rented by the LeTourneau Company, and there is evidence to support the allegation that it was being flown at the time of the crash on business of the lessee by Don Phillip LeTourneau, an employee of the LeTourneau Company. Young Morrison was a night watchman for LeTourneau Company and there is no evidence tending to show that he was about the business of, or authorized by, the LeTourneau Company in making the flight. Whether he was riding at his own request, or for a consideration to the pilot, or at the request or permission of the pilot, or as a student of aviation, or as an air hitchhiker back to his native Tennessee, to which State the plane was evidently headed, are unsolved questions.

The complaint alleged: (a) That the plane was negligently and carelessly operated by the agent and employee of Le Tourneau Company; (b) that the plane was negligently and carelessly overloaded beyond its carrying capacity in that it was loaded with machinery weighing in excess of 75 pounds, more or less; (c) that the plane was in defective condition and not suitable for carrying two passengers plus machinery in a cross country flight from Toccoa, Georgia, to Morristown, Tennessee.

Residents of Sandy Mush Gap testified that it was foggy, misty, and cloudy, and that "a severe wind for that time of year" was sweeping around the mountains; that a plane was heard above the fog or clouds an hour and one-half before the crash and at other and later intervals; that the motor of a plane heard by one witness, more than an hour before, appeared to be functioning badly; that planes frequently pass over that section. There is no definite proof that the plane motor or motors heard considerably earlier was of the plane in question. One witness saw the plane after it had started its plunge earthward. It then had a broken wing, and the wing was "turned back towards the tail of the plane". Another witness saw the plane a few seconds earlier, and her testimony was that the motor was popping, and that the plane shot straight upward some 200 feet, and that the wings were all right "until it turned back down", and that when it turned back down a wing broke, "just like the breaking of a limb on a tree".

The wrecked motor had dual ignition switches and both were on. The plane was dual controlled so that a person sitting in either of the two seats could handle the controls, and thereby fly, or interfere with flying, the plane.

The cause of the crash is as enshrouded in doubt as was Beaverdam in the fog,

cloud, and mist that the Northeast wind swirled around the scrub-pine that thatched its dome that morning.

No one can answer with any certitude: (a) Why Morrison was on the plane; (b) Who was piloting or attempting to pilot the plane; (c) What or who caused it to "shoot straight up 200 feet" and tear one wing loose; (d) Was the force that shot it up in the air the cause of the crumpling of the wing or was it a defective wing that caused the fall, and, if defective, was it patently or hiddenly defective; (e) Whether the pilot entered the fog with or without reason to suspect its depth, height, and extent, and whether he in attempting to get under the fog below the mountain peaks found another peak facing him and in undertaking to clear the peak shot the plane straight up but struck tree tops and damaged a wing. (This could have occurred in the exercise of reasonable skill to any pilot and any plane under the assumed circumstances. It was testified that the cloud, mist, and fog were not in the valleys but only around the mountains.) (f) Did Morrison get excited and grab the controls; (g) Did a wind of cyclonic force toss the plane to destruction?

Theories could doubtless be further multiplied as to how the accident occurred, but each must have as its basis only speculation and conjecture. Evidence fails to supply any proof as to the direct or proximate cause of the accident.

The doctrine of res ipsa loquitur cannot apply in cases of this sort, because there is no showing that accidents of this very nature cannot happen to the most skillful pilots in planes of the finest type and condition. Even if the doctrine of res ipsa loquitur were applicable, there would be the impossibility of determining the defendant against whom the rule should be applied, since the two defendants are charged with separate and distinct acts of negligence. Would the jury be permitted arbitrarily to find that because a wing broke under the circumstances the Flying School furnished a defective ship, or that the ship was negligently operated by the LeTourneau Company? The doctrine of res ipsa loquitur does not supply the material answer that is requisite. Neither does the evidence. It was wholly impossible for the jury to have determined from the evidence, and the inferences reasonably to have been drawn therefrom, either that the ship was defective or that it was negli-

gently operated by LeTourneau. If the proven facts give equal support to each of two inconsistent inferences, then neither is established, and "judgment, as a matter of law, must go against the party upon whom rests the necessity of sustaining one of these inferences as against the other, before he is entitled to recover". Chamberlain v. Pennsylvania R. Co., 288 U.S. 333, 53 S.Ct. 391, 393, 77 L.Ed. 819.

It is urged that the pilot, LeTourneau, was not licensed to carry passengers, and that he violated the Federal regulations and statute in that the pilot had only a private pilot's license and was not authorized to take passengers aloft, and that this constituted negligence per se. This contention of appellant overlooks the further requisite that the violation of the statute must be the proximate cause of the injury. The evidence here wholly fails to show the proximate cause of the injury, but leaves this important issue entirely to conjecture and speculation. There is argument that the possession of only a private pilot's license is evidence, or the basis of a presumption, that the possessor is lacking in skill as a pilot. This does not necessarily follow. He may not have chosen to take further examinations although he might have been abundantly qualified for commercial or transport license for aught the record shows.

It is also argued that the plane was overloaded, but this is denied by the appellant's own witness, Richardson, who testified, from certain assumptions as to the weights of LeTourneau and Morrison and as to the amount of gas, that although the plane would have been overloaded 60 pounds at the start of the trip the consumption of gasoline en route would have reduced the weight to the point that it was not overloaded at the time of the accident. The evidence as to any overloading at the inception of the trip was decidedly conjectural.

The proof of negligence as to either defendant was too indefinite and inadequate. The evidence is as consistent with the theory of an unavoidable accident as it is with either theory of negligence as to either defendant, and in the absence of any available presumptions to aid the plaintiff the lower court was without error in entering judgment for the defendants. The judgment on the main appeal is affirmed, which renders it unnecessary to pass upon the cross-appeal, which is, therefore, dismissed.